UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| AVENUE 6E INVESTMENTS, LLC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | 2:09-cv-00297 JWS |
| vs. | ) ) | **ORDER AND OPINION** |
| CITY OF YUMA, ARIZONA, a municipal corporation, | ) ) ) ) | **[Re: Motion at Docket 146]** |
| Defendant. | ) ) ) | |

## I. MOTION PRESENTED

At docket 146, the City of Yuma, Arizona ("the City") has filed for summary judgment on the sole remaining claim in this case – the Fair Housing Act disparate impact claim. The City argues that plaintiffs Avenue 6E Investments, LLC and Saguaro Desert Land, Inc. (jointly "Plaintiffs" or "the Hall Companies")[1] cannot state a prima facie case of disparate impact under the federal Fair Housing Act because of the abundant housing supply in the market at the time it denied Plaintiffs' rezoning request. The

---

[1] The members and stockholders of Avenue 6E Investments, LLC and Saguaro Desert Land, Inc. are brothers Brian L. Hall, Fred T. Hall, and Michael T. Hall.

City's statement of facts and supporting materials are located at docket 147.[2]  Plaintiffs' response to the motion is at docket 171.  Plaintiffs filed a response to the City's statement of facts at docket 162[3] and filed their own statement of facts at docket 164.[4]  The City's reply is at docket 182 and its response to Plaintiffs' statement of facts is at docket 180.[5]  Oral argument was requested but would not assist the court.

## II.  BACKGROUND

This action arises from the City's denial of the Hall Companies' rezoning application for a 42-acre parcel of undeveloped land in Yuma, Arizona ("the Property").  The Property is located in the southeast portion of Yuma; specifically, on the west side of Avenue 6E and about one-half mile south of 32nd Street.[6]  The south end of the Property abuts a low-density R-1-8 subdivision, Belleza Phase 1.  The north end of the Property is bordered by a recreational vehicle village.  The City owns the parcel of land to the east of the Property, which is designated for use as a wastewater facility and municipal park.  To the west of the Property is the Terra Bella subdivision, which is zoned R-1-6 (minimum 6,000-square-foot lots) but contains lots larger than the minimum lot size.[7]

Prior to 2006 the Property was part of a larger 80-acre parcel of land owned by KDC of Yuma, LLC ("KDC").  KDC applied to rezone the 80-acre parcel from agricultural to R-1-8 (minimum 8,000-square-foot lots).  The City Counsel granted the

---

[2]The City's statement of facts is hereafter referenced as City's SOF.

[3]Plaintiffs' response to the City's statement of facts is hereafter referenced as Plaintiffs' RSOF.

[4]Plaintiffs' additional statement of facts is hereafter referenced as Plaintiffs' SOF.

[5]The City's response to the Plaintiffs' statement of facts is hereafter referenced as City's RSOF.

[6]City's SOF ¶ 3.

[7]Doc. 146-1 at pp. 2, 11.

rezoning application, after which KDC obtained approval of a preliminary plat on the entire parcel that set out single family lots that were at least 8,000 square feet.[8] KDC developed the southern 38 acres, known as Belleza Phase 1, and then sold the remaining 42 acres, the Property, to the Hall Companies. The Hall Companies purchased the Property from KDC for $5.8 million, or around $135,000 an acre.[9]

In 2008, the Hall Companies determined that development of the Property with R-1-8 zoning was not feasible because there was no demand for large-lot expensive homes in Yuma due to existing inventory and the housing market decline.[10] Consequently, the Hall Companies designed a development consisting of smaller lots: approximately 198 lots each 6,000 square feet.[11] The Hall Companies intended to construct affordable and moderately priced homes using a housing product— the Sunrise model home—they had built in another one of their subdivisions, Ocotillo Unit 5, located approximately 1.25 miles south of the Property.[12] Unlike the more expensive large-lot homes, they believed that these affordable or moderately priced homes were still in demand.[13] The Hall Companies deemed "affordable" to mean entry-level houses priced between $120,000 and $150,000 and moderately priced to mean mid-level houses priced between $150,000 and $175,000.[14] Specifically, their proposed price range for the Sunrise model to be constructed on the Property was between $125,200

---

[8]City's SOF ¶¶ 8-9.

[9]City's SOF ¶¶ 4-5.

[10]City's SOF ¶ 13.

[11]City's SOF ¶¶ 14, 18.

[12]City's SOF ¶¶ 15, 38, 42.

[13]City's SOF ¶ 13.

[14]City's SOF ¶ 16. Plaintiffs' RSOF ¶ 16. The Hall Companies' definitions of affordable and moderately priced housing are not matched to affordability standards set forth in HUD's regulations. For purposes of this order, the court uses the terms "affordable" and "moderately priced" as defined by Plaintiffs.

and $159,800.[15]  They were not seeking to develop low-income housing as defined by the Department of Housing and Urban Development ("HUD").[16]

In order to implement the new plan, the Hall Companies submitted an application to the City to rezone the property from R-1-8 to R-1-6.  Zoning designations R-1-8 and R-1-6 are both considered low-density zoning designations in Yuma, only one density gradient apart.[17]  In September of 2008, the City Council, after hearing objections from surrounding landowners, denied the rezoning application.[18]

The Hall Companies filed an amended complaint against the City, alleging violations of their equal protection and substantive due process rights under 42 U.S.C. §1983, claims of discriminatory intent and disparate impact under the federal Fair Housing Act, 42 U.S.C. §33601 *et seq.* ("FHA"), and violations of Arizona constitutional and statutory law.   The City moved to dismiss all claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The court granted that motion as to all of the claims except for the disparate impact claim under the FHA.  In support of the disparate impact claim, Plaintiffs allege that the racial makeup of purchasers of the proposed R-1-6 development on the Property would have consisted of more Hispanic people than the racial makeup of purchasers of a large-lot development in a R-1-8 subdivision.  Thus, according to Plaintiffs' amended complaint, the City's refusal to rezone the Property to R-1-6 from R-1-8 had a discriminatory adverse impact on Hispanics.  Plaintiffs also allege that the proposed development would have had an integrative effect by providing additional affordable housing options within a predominately white area of Yuma and outside the existing segregated areas in Yuma that were predominately Hispanic.

---

[15] Plaintiffs' SOF ¶ 9.

[16] City's RSOF 13; Doc. 168-2 at 37.

[17] City's SOF ¶ 7.

[18] City's SOF ¶ 17.

The City filed two motions for summary judgment; one at docket 146 and one at docket 148. In the motion at docket 146, the City argues that Plaintiffs cannot meet their prima facie burden for a disparate impact claim under the FHA because of the glut of housing opportunities that were similar to the Plaintiffs' proposed development on the Property in the southeast portion of Yuma at the time of its rezoning denial. The City presents an alternative basis for summary judgment at docket 148, arguing that Plaintiffs have failed to present the appropriate statistics to meet the prima facie test for disparate impact and that it had a legitimate and nondiscriminatory basis for denying the rezoning. This order only addresses the motion at docket 146.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[20] There can be no genuine issue as to any material fact if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[21] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[22] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving

---

[19]Fed. R. Civ. P. 56(a).

[20]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[21]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[22]*Anderson*, 477 U.S. at 248.

party.[23] The reviewing court may not weigh evidence or assess the credibility of witnesses.[24]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[25] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[26] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[27] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[28] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[29]

## IV. DISCUSSION

Under the FHA it is unlawful to "make unavailable or deny" a "dwelling" to a person because of that person's race, color, religion, sex, familial status, or national origin.[30] A dwelling includes "any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof."[31]

---

[23]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[24]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[25]*Celotex*, 477 U.S. at 323.

[26]*Id.* at 323-25.

[27]*Anderson,* 477 U.S. at 248-49.

[28]*Id.* at 255.

[29]*Id.* at 248-49.

[30]42 U.S.C. §3604(a).

[31]42 U.S.C. §3602(b).

1 What it means to "make unavailable or deny" a dwelling is not specifically defined in the
2 statute, but municipal land use decisions that block or impede the provision of housing
3 are included.[32] A plaintiff can establish an FHA violation under a theory of disparate
4 treatment or disparate impact. As noted above, Plaintiffs' only remaining claim involves
5 a disparate impact theory.

6 "To establish a prima facie case of disparate impact under the FHA, 'a plaintiff
7 must show at least that the defendant's actions had a discriminatory effect.'"[33] Actions
8 have a discriminatory effect if they actually or predictably result in discrimination.[34]
9 Borrowing from age discrimination cases in the employment context the Ninth Circuit
10 has identified the elements of an FHA prima facie case under a disparate impact
11 theory: "'(1) the occurrence of certain outwardly neutral . . . practices, and (2) a
12 significantly adverse or disproportionate impact on persons of a particular [type]
13 produced by the [defendant's] facially neutral acts or practices.'"[35] A plaintiff must prove
14 the discriminatory impact at issue; merely raising an inference of discriminatory impact
15 is insufficient.[36] Statistical analysis is often the method by which a plaintiff makes the
16 required a demonstration.

17 In this case, the City's denial of Plaintiffs' rezoning application is the outwardly
18 neutral practice at issue. In order to show that this practice had a disproportionate
19 effect on Hispanics, Plaintiffs conducted statistical analysis based on a pool of qualified
20 home buyers in Yuma at the time of the rezoning denial. Based on home loan data

---

[32]*San Pedro Hotel Co., Inc. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998); *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010).

[33]*Pfaff v. U.S. Dept. of Hous. and Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996) (quoting *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988)).

[34]*Id.*

[35]*Id.* (quoting *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986)) (brackets in original).

[36]*Id.* at 746.

from 2007 to 2009, Plaintiffs estimated the percentage of Hispanics that could purchase homes in the price range of $120,000 to $175,000 (the predicted price range for homes Plaintiffs planned to build on the Property) and then estimated the percentage of Hispanics that could purchase homes in the price range of $259,000 to $333,000 (the prices range for homes in the neighboring larger-lot subdivisions). They argue that the data shows that the percentage of Hispanics purchasing homes in the higher price range was significantly lower than the percentage of Hispanics purchasing homes in the lower price range (30% compared with 45%) and thus the City's decision to deny the Property a R-1-6 zoning designation, and thus deny the availability of more affordable housing opportunities, had a discriminatory impact on Hispanics.

The City filed a separate motion to challenge Plaintiffs' statistical analysis, but in the motion at docket 146, the City argues more generally that regardless of the statistical analysis put forth by Plaintiffs, they are unable to meet their burden of putting forward a prima facie case. It argues that the glut of affordable new homes in the immediate area around the Property means that the denial did not prevent anyone from actually purchasing an affordable new home in the area and thus there could not have been a disparate impact on Hispanics because of the City's denial.

**A. Housing Supply**

The City cites an Eleventh Circuit case, *Hallmark Developers, Inc. v. Fulton County*,[37] in support of its argument. *Hallmark* also involved a denial of a private developer's rezoning request. The developer in *Hallmark* sought to have the property at issue rezoned from agricultural to mixed use, so as to allow a development that would include commercial space, office space, and affordable housing. Following the denial of the rezoning request, the plaintiff sued under the FHA alleging that the denial had a disparate impact on African-Americans. The Eleventh Circuit upheld the district court's ruling that the plaintiff had failed to establish a prima facie case of disparate impact

---

[37] 466 F.3d 1276 (11th Cir. 2006).

because of flaws in the plaintiff's statistical analysis. The court noted the relevancy of housing supply to the analysis: "If there is a glut in the market of homes in [the plaintiff's] projected price range, the lack of [the plaintiff's] particular development is not likely to have an impact on anyone, let alone adversely affect one group disproportionately."[38] It stressed the difficulty in measuring the impact of a failure to build a particular housing development when other housing is available. It also rejected the plaintiff's argument that blocking the development denied minority households the opportunity and advantage of increased housing supply, stating that there is no support for the proposition that an individual has a right to "increased housing choices and supply."[39]

      The City presents data to show that there was an adequate supply of R-1-6 lots and affordable homes for sale in southeastern Yuma during the time period surrounding the City's denial of Plaintiffs' rezoning request. While it argues that relevant local housing market is Yuma as a whole, it limited its housing market data to the southeast portion of Yuma,[40] the quadrant where the Property is located and the area Plaintiffs allege to be impacted by the City's denial of the rezoning request. Concerning new homes in the vicinity of the Property offering homes that Plaintiffs deem affordable, the City's data shows there was an available supply of similar housing opportunities in southeastern Yuma. There were approximately 50 available lots for sale in the Ocotillo Unit 5 development at the time of the rezoning denial, which again was only 1.25 miles away from the Property and was owned and developed by the Hall Companies.[41] The lots in Ocotillo Unit 5 offered the same Sunrise homes that Plaintiffs intended to offer on

---

[38]*Id.* at 1287.

[39]*Id.* at 1288.

[40]This area is defined as the area "south of 32nd Street, west of County 9E, north of Count 14th Street and east of County 6E." City's SOF ¶ 20.

[41]City's SOF ¶¶ 27, 38.

the Property and those homes were being sold within Plaintiffs' "affordable" price range.[42] Ocotillo Unit 5 continued to have lots available in 2010.[43] Furthermore, in January 2010, before Plaintiffs sold all of the lots in Octotillo 5, they made lots available in a development with R-1-6 zoning just 1.5 mile away from the Property, Saguaro 1, which was built as a result of the rezoning denial.[44] Saguaro 1 contains the Sunrise product that Plaintiffs were going to build on the Property, and as of June 2011 there were still 85 lots available in that subdivision.[45] Another subdivision built by the Hall Companies, Trail Estates 5, is located 2.5 miles east of the Property and is zoned R-1-6.[46] Although Trail Estates 5 did not offer the same housing product they had planned to build on the Property, the Hall Companies nonetheless offered affordable single family housing in that subdivision.[47] At the time of the rezoning decision, Trail Estates 5 had 205 lots available.[48] Trail Estates 5 continued to have available lots in 2011.[49]

More broadly, there were hundreds of other platted lots zoned R-1-6 available at the time of the zoning denial.[50] As Plaintiffs note, however, some of those lots had houses above what Plaintiffs considered moderately-priced. Specifically, the Ocotillo Unit 4B subdivision had almost 200 lots available at the time of the rezoning denial but the houses on those lots were selling over the price range that the Hall Companies

---

[42]City's SOF ¶¶ 38, 42.

[43]City's SOF ¶ 51.

[44]City's SOF ¶¶ 57, 59, 60, 61.

[45]City's SOF ¶¶ 58, 62.

[46]City's SOF ¶ 40.

[47]City's SOF ¶ 36; Plaintiffs' RSOF ¶ 36.

[48]City's SOF ¶¶ 23, 31.

[49]City's SOF ¶¶ 36, 50.

[50]City's SOF ¶ 23.

intended to build on the Property and only 61 of those lots were available within a "mid-level" price range, and those were still slightly above what Plaintiffs wanted to offer on the Property ($173,000 to 205,000).[51] The Sierra Montana subdivisions also had available lots but they were more expensive.[52]

Even more broadly, the City's data shows that there were about 300 acres of undeveloped land zoned R-1-6 or more dense in the southeastern area. This data shows there were lands slotted and available for housing at a density higher than R-1-8 in the area, but, as Plaintiffs argue, the City cannot predict what type of housing a developer will offer on these lots nor what the prices will be.[53]

Finally, the City puts forth evidence to show that Michael Hall, a member of the Hall Companies, estimated that between 2008 and 20011 there had been a three- to six-month supply of homes in Yuma in the price range of $120,000 to $170,000.[54] Although, Michael Hall also noted that the during the later half of 2009 to about April of 2010 there was a push for housing under $150,000 and that he would guess there was under a three-month supply of this entry-level housing during that time period.[55] The City also presented evidence to show that the Hall Companies had planned to develop over 1,000 acres of land just one mile east of the Property to include 4,000 new homes and apartments and some R-1-6 zoning, but they withdrew the rezoning application for this land in 2007 because it was not "feasible" to "develop a parcel as large as 1,160 acres in Yuma, Arizona" due to "slow housing sales."[56]

---

[51]City's SOF ¶¶ 28, 29; Plaintiffs' RSOF ¶ 23.

[52]Plaintiffs' RSOF ¶ 23.

[53]City's SOF ¶ 32.

[54]City's SOF ¶ 33.

[55]Plaintiffs' RSOF ¶ 33.

[56]City's SOF ¶¶ 43, 46.

Plaintiffs object to the City's data. Some of the objections Plaintiffs have regarding the data relate to authentication and hearsay, but those concerns have been addressed by the City in its reply.[57] Plaintiffs' primary objection to the City's data is on relevance grounds. They argue that housing supply is not relevant because the purpose of their request for R-1-6 zoning was to enable Plaintiffs to build houses in a specific price range on a specific property with a desirable location and because the housing in surrounding subdivisions is not necessarily comparable to the housing they proposed for the Property. Relevancy arguments aside, the City's numbers are not in dispute, because Plaintiffs do not offer evidence to suggest that the City's numbers were wrong or that the supply of housing was significantly less than represented by the City. Plaintiffs do not set forth evidence to demonstrate that there was a shortage of affordable housing. Thus, it is undisputed there was a supply of R-1-6 lots and affordable to moderately priced homes available in the southeast portion of Yuma at the time of the zoning denial and a couple year thereafter. Furthermore, and more specifically, the evidence shows there was a supply of housing within the price range that Plaintiffs proposed to offer on the Property at the time of the zoning denial, and, even more specifically, some of that supply consisted of the same Sunrise homes proposed for the Property and was within the same price range less than two miles away. That supply continued to exist after the rezoning denial.

The court concludes that housing supply is relevant. *Hallmark* is on point and persuasive: if there is an adequate supply of homes in the predicted price range of a proposed development, the failure of that development to come fruition "is not likely to have an impact on anyone, let alone adversely affect one group disproportionately."[58] Without a shortage or an identified need, there is difficulty in defining the group affected by a rezoning decision and any statistical analysis trying to do so becomes inherently

---

[57] Doc. 182, n.2; Doc. 182-1.

[58] *Hallmark*, 466 F.3d at 1287.

-12-

speculative. Plaintiffs stress that even if housing supply is relevant, the housing supply that existed was not comparable to their proposed development for the Property. They argue that the existing affordable or moderately priced housing supply did not offer the same lot size, with the same home style, in the same price range, in the same desirable location. Alternatively, they argue that a jury should decide if the housing supply was comparable to the proposed development. In other words, Plaintiffs assert that the City denied residents the opportunity to purchase a particular home on a particular block in a particular price range. But, the court in *Hallmark* found no authority to support the argument that an individual has a right to "increased housing choices and supply."[59] Moreover, as the *Hallmark* court wrote, "[r]ecognizing a right to 'increased housing choices and supply' would effectively place an affirmative duty on governing bodies to approve all re-zoning applications wherein a developer sought to build housing within a particular price range."[60]

The parties do not cite any case discrediting *Hallmark* or the reasoning contained therein. In fact, the Fifth Circuit in *Artisan/American Corp. v. City of Alvin, Texas*,[61] also held that a plaintiff cannot make a prima facie case of disparate impact when there is evidence that there are comparable building sites near the subject property. The court finds Plaintiffs' attempts to distinguish *Hallmark* or criticize its reasoning unpersuasive. Indeed, cases addressing FHA disparate impact claims, while not specifically addressing the issue, have arisen within the context of a demonstrated shortage of or need for housing. As the court noted in *Hallmark*, in the majority of cases where

---

[59]*Hallmark*, 466 F.3d at 1288.

[60]*Id.*

[61]588 F.3d 291 (5th Cir. 2009).

-13-

disparate impact was found, "invariably there was a waiting list for affordable housing or a shortage of housing for which only a defined group qualified."[62]

While no Ninth Circuit case has directly addressed the issue, Ninth Circuit cases demonstrate that disparate impact claims are often raised in the face of at least an alleged need for housing. In *Keith v. Volpe*,[63] there was a need for housing for people displaced as a result of a new freeway. In *Budnick v. Town of Carefree*,[64] the plaintiff alleged that a certain type of continuing nursing care facility was entirely absent from the municipality. In *Gamble v. City of Escondido*,[65] the plaintiff argued that there was a lack of adult day care health facility. In *Gamble* and *Budnick* the Ninth circuit held that merely showing a shortage of housing is not sufficient, in and of itself, to prove disparate impact. No Ninth Circuit case contradicts *Hallmark's* conclusion that disparate impact cannot be established when the relevant housing is available.

Limiting the data to subdivisions in the southeastern area offering housing in a similar price range, the court concludes that there were similarly priced single family housing options for purchase in the vicinity of the Property, and thus no shortage of "affordable" housing opportunities. The supply of housing options in southeatern Yuma prevents Plaintiffs from being able to present a prima facie case of disparate impact that is more than speculative. In fact, the evidence shows that because the Hall Companies were unable to build the desired development on the Property, they opted to build that same development on land they owned just 1.5 miles to the east, which was already zoned R-1-6. Thus, the zoning denial did not result in any decline of

---

[62]*Hallmark*, 466 F.3d at 1287 (listing cases); *see also Gallagher v. Magner,* 619 F.3d 823 (8th Cir. 2010) (holding that the plaintiffs established a prima facie case of disparate impact where there was a finding that the city had a shortage of affordable housing for its low income residents).

[63]858 F.2d 467 (9th Cir. 1988).

[64]518 F.3d 1109 (9th Cir. 2008).

[65]104 F.3d 300 (9th Cir. 1997).

housing supply in that price range, and thus did not reduce opportunities for Hispanics to live in southeastern Yuma. There was no actual discriminatory effect.

**B. Segregation**

Plaintiffs also argue they can prove an FHA violation under a theory of disparate impact by showing that the City's refusal to rezone caused harm to the community generally by the perpetuation of segregation.[66] They argue that southeastern Yuma has a higher concentration of white people, and thus the development of more affordable housing on the Property would help integrate Hispanics into the southeastern area. By refusing to rezone, Plaintiffs argue, the City perpetuated segregation.

The court finds Plaintiffs' argument unavailing. As noted above, the City's denial of Plaintiffs' rezoning request did not impede the development of more affordable housing in the area because there was an adequate supply of such housing already available. Furthermore, even assuming the proposed development would have had an integrative effect because of the proposed pricing, that integrative effect was still accomplished through the development of Plaintiffs' Saguaro subdivision, which is just 1.5 miles east of the Property and which the record demonstrates was built in lieu of the proposed development on the Property.

The court also concludes that Plaintiffs cannot prevail on a perpetuation of segregation theory given the numbers presented. Hispanics are not a minority in Yuma; they actually constitute 55% of the population.[67] In 2010, the southeastern area of Yuma had a white population of somewhere between 48% and 65%, down from 75% in 1990.[68] Therefore, at the time of the rezoning in 2008, the numbers show that

---

[66]Plaintiffs cite to a Second Circuit case, *Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 937 (2d Cir. 1988), and HUD's FHA regulations, specifically 24 C.F.R. § 100.70(a), in support of their argument that a prima facie case of disparate impact can be made by demonstrating the zoning decision at issue perpetuated segregation.

[67]Doc. 164-3 at p. 30.

[68]Plaintiffs' SOF ¶ 63; Doc. 163-3 at p. 23.

Hispanics were integrating into the area.  Also, assuming that the Plaintiffs' proposed development would have had been about half Hispanic and half white as Plaintiffs claim,[69] the integrative effect of that development in southeastern Yuma, which was somewhere around 48% and 65% white based on the 2010 Census, would not have been significant enough to support a disparate impact claim.[70]

## V. CONCLUSION

Based on the preceding discussion the City's motion for summary judgment at docket 146 is HEREBY GRANTED.  The Clerk will please enter judgment for defendant and close this case.

DATED this 5th day of June 2013.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[69]Doc. 175 at p.11.

[70]See Huntington Branch, 844 F.2d at 937 (area around the property at issue was 98% white and a disproportionate percentage of people on the waiting list for housing that would have been built on the property were minorities); Metro. Hous. Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1288 (7th Cir. 1977) ("Arlington Heights remains almost totally white in a metropolitan area with a significant percentage of black people. Since [the proposed project] would have to be racially integrated in order to qualify for federal subsidization, the Village's action in preventing the project form being built had the effect of perpetuating segregation.").