# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

AVENUE 6E INVESTMENTS, LLC, *et al.*,

    Plaintiffs,

vs.

CITY OF YUMA, ARIZONA, a municipal corporation,

    Defendant.

2:09-cv-00297 JWS

ORDER AND OPINION

[Re: Motion at Docket 242]

## I. MOTION PRESENTED

At docket 242, the City of Yuma, Arizona ("the City") has filed another motion for summary judgment as to plaintiffs' Fair Housing Act disparate impact claim. The City argues that plaintiffs Avenue 6E Investments, LLC and Saguaro Desert Land, Inc. (jointly "Plaintiffs" or "the Hall Company")[1] cannot bring a FHA disparate impact claim based upon a rezoning denial. Plaintiffs filed a response at docket 249. The City replied at docket 252. Oral argument was requested, but the briefing is thorough and argument would not assist the court.

---

[1] The members and stockholders of Avenue 6E Investments, LLC and Saguaro Desert Land, Inc. are brothers Brian L. Hall, Fred T. Hall, and Michael T. Hall.

## II. BACKGROUND

This action arises from the City's denial of the Hall Company's rezoning application for a 42-acre parcel of undeveloped land in Yuma, Arizona ("the Property"). The Property is located in the southeast portion of Yuma. The south end of the Property abuts a low-density R-1-8 subdivision, Belleza Phase 1. The north end of the Property is bordered by a recreational vehicle village. The City owns the parcel of land to the east of the Property, which is designated for use as a wastewater facility and municipal park. To the west of the Property is the Terra Bella development. At the time of the events in this case, Terra Bella was zoned R-1-6 (minimum 6,000-square-foot lots) and had two phases of development. The first phase abutted the Property on the Property's southwest corner and had been platted for lots larger than the minimum lot size of 6,000 square-feet, ranging from 8,000 to 20,000 square feet. Only a couple of lots within the first phase of development had been sold and developed during the relevant time period. The second phase abutted the Property to the west and northwest. It was vacant land that had not been platted.

Prior to 2006 the Property was part of a larger 80-acre parcel of land owned by KDC of Yuma, LLC ("KDC"). KDC applied to rezone the 80-acre parcel from agricultural to R-1-8 (minimum 8,000-square-foot lots). The City Council conditionally granted the rezoning application, after which KDC obtained approval of a preliminary plat on the entire parcel that set out single family lots that were at least 9,000 square feet. KDC developed the southern 38 acres, Belleza Phase 1, and then sold the remaining 42 acres, the Property, to the Hall Company. The Hall Company purchased the Property from KDC for $5.8 million, or around $135,000 an acre. At the time of the

sale, the Property was still conditionally zoned R-1-8 and still had KDC's preliminary plat providing for 129 lots of least 8,000 square feet.

In 2008, the Hall Company determined that development of the Property with R-1-8 zoning was not financially viable because there was no demand for large-lot, higher-priced homes in Yuma due to existing inventory and the housing market decline. Consequently, the Hall Company designed a development consisting of smaller lots: approximately 198 lots, each about 6,000 square feet. The Hall Company intended to construct affordable and moderately priced homes using a housing product it had built in another one of its subdivisions. Unlike more expensive large-lot homes, it believed that these affordable or moderately priced homes were still in demand. The Hall Company deemed "affordable" to mean entry-level houses priced between $120,000 and $150,000 and moderately priced to mean mid-level houses priced between $150,000 and $175,000. Specifically, the proposed price range for the houses to be constructed on the Property was between $125,200 and $159,800. They were not seeking to develop low-income housing as defined by the Department of Housing and Urban Development.

In order to implement the new plan, the Hall Company submitted an application to the City to rezone the Property from R-1-8 to R-1-6. Zoning designations R-1-8 and R-1-6 are both considered low-density zoning in Yuma, only one density gradient apart. The City's planning staff recommended that the City Council approve the rezoning request, finding it consistent with the City's General Plan for the area, which designated the area for low-density residential development.

Neighborhood opposition to the rezoning was subsequently communicated to City Council members through letters and at public meetings. People voicing opposition primarily based their objection to the rezoning on their belief that higher-density development and lower-priced homes would increase crime and reduce property values. Based on the substance of these comments, their expectation of increased crime and lower property values was based on the "demographics" that they associated with the Hall Company's other developments; the Hall Company was known for developing low and moderately priced homes, and its representative estimates that at least half of the purchasers of its homes were Hispanic. In September of 2008, the City Council denied the rezoning application. The rezoning denial was the first denial by the City Council since 2005 out of a total of 76 rezoning requests.

The Hall Company filed a complaint against the City, alleging violations of their equal protection and substantive due process rights under 42 U.S.C. § 1983; claims of discriminatory intent and disparate impact under the federal Fair Housing Act, 42 U.S.C. § 33601 *et seq.* ("FHA"); and violations of Arizona constitutional and statutory law. The City moved to dismiss all claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court originally granted that motion as to all of the claims except for the disparate impact claim under the FHA.

The City later filed two motions for summary judgment on that claim. In the motion at docket 146, the City argued that Plaintiffs could not meet their prima facie burden of establishing disparate impact claim under the FHA because of the glut of housing opportunities in the southeast portion of Yuma that were similar to Plaintiffs' proposed development on the Property. The City presented an alternative basis for

summary judgment at docket 148, arguing that Plaintiffs failed to present the appropriate statistics to meet the prima facie test for disparate impact and also that it had a legitimate and nondiscriminatory basis for denying the rezoning request. The court granted the motion at docket 146, finding that Plaintiffs could not meet their prima facie burden because of other housing opportunities in the area, relying on an Eleventh Circuit case *Hallmark Developers, Inc. v. Fulton County*.[2] It then denied the motion at docket 148 as moot and therefore did not address the City's challenge to Plaintiffs' statistical showing of disparate impact.

On appeal, the Ninth Circuit reserved the court's initial dismissal of Plaintiffs' discriminatory intent claim under the FHA. It held that Plaintiffs' claim—that the City Council's denial of their rezoning request constituted disparate treatment under the FHA and Equal Protection—was plausible given allegations that 1) the public comments consisted of language that a reasonable jury could interpret to be racially charged code words; 2) the planning commission had unanimously voted in favor of the rezoning request; and 3) the City Council had not denied a rezoning request in three years.[3] The Ninth Circuit also reversed this court's finding of summary judgment in favor of the City as to Plaintiffs' disparate impact claim under the FHA. It rejected the Eleventh Circuit's holding in *Hallmark* that similar housing opportunities within the general area of the

---

[2]466 F.3d 1276 (11th Cir. 2006). The court in *Hallmark* held that a developer failed to establish disparate impact on a protected group as a result of the county's denial of the developer's application to rezone land for the purpose of building a development with affordable housing because there was an oversupply of homes in the developer's projected price range in the southern part of the county where the property at issue was located.

[3]*Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 509 (9th Cir. 2016).

-5-

property denied for rezoning negated the possibility of any disparate impact.[4]  It reasoned that adopting such a holding "would prematurely cut short the carefully constructed mode of analysis that the [Supreme] Court just recently established" in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,[5] which was issued after this court's order granting summary judgment.

After the remand, at docket 218, the City renewed its prior motion for summary judgment on Plaintiffs' disparate impact claim based on the inadequacy of Plaintiffs' prima facie case.  The court subsequently denied the motion at docket 235, concluding that Plaintiffs had presented a prima facie case of disparate impact and that there were issues of fact as to the City's stated justifications for the denial.  The City now argues that a close examination of *Inclusive Communities* requires the court to grant summary judgment on Plaintiffs' disparate impact theory of liability, not based on an insufficient prima facie showing or its adequate justification, but based on the fact that this case involves a "one-off" zoning decision and not a greater land use policy.

The City also asks for summary judgment as to Plaintiffs' claim for failure to further fair housing that is set forth in Count V of the proposed Second Amended Complaint, which the parties agree is now the operative complaint.  Plaintiffs had originally sought to file the Second Amended Complaint in 2010 to add a claim for failure to further fair housing and to add an allegation in support of its intentional discrimination claim.  The court did not allow the amendment, concluding the proposed

---

[4]*Id.* at 511-13.

[5]135 S. Ct. 2507 (2015).

new claim was invalid and the additional allegation would not change the court's conclusion regarding the dismissed intentional discrimination claim. After the Ninth Circuit's remand, the intentional discrimination claim was revived and therefore the additional allegation is no longer moot. Plaintiffs made clear at docket 247 that the Second Amendment Complaint is the operative complaint only for the purpose of including the additional allegation and not to add a new claim. They conceded that they do not seek to pursue any claims that they did not challenge on appeal, including the claim for failure to affirmatively further fair housing. Again, at docket 249, Plaintiffs clarify that the additional claim in the Second Amended Complaint is not a live claim. Therefore, the City's request for summary judgment on that claim is unnecessary.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[7] There can be no genuine issue as to any material fact if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[8] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could

---

[6] Fed. R. Civ. P. 56(a).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

return a verdict for the nonmoving party."[9]  In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[10] The reviewing court may not weigh evidence or assess the credibility of witnesses.[11]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[12]  The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[13]  Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[14]  All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[15]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[16]

---

[9]*Anderson*, 477 U.S. at 248.

[10]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[11]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[12]*Celotex*, 477 U.S. at 323.

[13]*Id.* at 323-25.

[14]*Anderson,* 477 U.S. at 248-49.

[15]*Id.* at 255.

[16]*Id.* at 248-49.

## IV. DISCUSSION

Under the FHA it is unlawful to "make unavailable or deny" a "dwelling" to a person because of that person's race, color, religion, sex, familial status, or national origin.[17] A dwelling includes "any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof."[18] A plaintiff can establish a FHA violation under a theory of disparate treatment or disparate impact. Disparate treatment is intentional discrimination; a governmental body cannot "zone land or refuse to zone land out of concern that minorities would enter a neighborhood."[19] Disparate impact discrimination, on the other hand, includes "actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason."[20] Disparate impact "'permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification.'"[21] It "also targets 'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities."[22]

---

[17] 42 U.S.C. § 3604(a).

[18] 42 U.S.C. § 3602(b).

[19] *Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 502 (9th Cir. 2016).

[20] *Id.* at 503.

[21] *Id.* (quoting *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys.*, 135 S.Ct. 2507, 2522 (2015)).

[22] *Id.* (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2522).

-9-

In *Inclusive Communities*, the Supreme Court confirmed what many circuits had already concluded, that disparate impact claims were cognizable under the FHA.

As noted above, the issue in this motion is Plaintiffs' FHA disparate impact claim. Such a claim is evaluated under the familiar burden-shifting framework.[23] At docket 235, the court considered whether summary judgment in the City's favor as to Plaintiffs' disparate impact claim was appropriate based on this burden shifting framework. It concluded summary judgment was not warranted. The City now asserts that summary judgment in its favor is still necessary because a one-time denial of a rezoning request cannot support a disparate impact claim as a matter of law, relying on language in *Inclusive Communities*.

In *Inclusive Communities*, a non-profit organization brought a FHA disparate impact action against the Texas Department of Housing and Community Affairs. It alleged that the department had allocated too many low income tax credits to development projects in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods, resulting in a disparate impact on African-American residents. The district court found in favor of the plaintiffs. On appeal, the Fifth Circuit held, consistent with its prior holdings, that disparate-impact claims under the FHA are in fact cognizable, but reversed and remanded the case on the merits based on the lower court's improper application of the burden-shifting framework. The department filed a petition for a writ of certiorari on the question of

---

[23]*See Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009); *see also* 24 C.F.R. § 100.500(c) (setting forth burden-shifting framework for disparate-impact claims under the FHA).

-10-

whether disparate impact claims are in fact cognizable under the FHA. The Supreme Court held in the affirmative.

In recognizing disparate impact claims, the Supreme Court emphasized the purpose of the FHA:

> The FHA, like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of our Nation's economy . . . . These unlawful practices include zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification. Suits targeting such practices reside at the heartland of disparate-impact liability.[24]

It stressed, however, that a plaintiff's mere demonstration of discriminatory effect does not resolve the issue of liability. FHA disparate impact claims are subject to "cautionary standards" and "safeguards":

> [D]isparate-impact liability has always been properly limited in key aspects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a showing of statistical disparity. Disparate-impact liability mandates the "removal of artificial, arbitrary, and unnecessary barriers," not the displacement of valid governmental policies. . . . The FHA is not an instrument to force housing authorities to reorder their priorities. Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation. . . . [H]ousing authorities and private developers [must receive] leeway to state and explain the valid interest served by their policies.[25]

As an example, the Court stressed that government entities "must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes."[26] In addition to emphasizing the need for burden shifting to allow a

---

[24]*Inclusive Cmtys.*, 135 S.Ct. at 2521-22.

[25]*Id.* at 2522.

[26]*Id.* at 2524.

-11-

defendant to justify the challenged policy, the court also emphasized the importance of causation in the context of FHA disparate-impact claims:

> In a similar vein, a disparate-impact claim that relies on a statistical disparity must fail *if the plaintiff cannot point to a defendant's policy or policies causing that disparity*. A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. . . . For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. It may also be difficult to establish causation because of the multiple factors that go into investment decision about where to construct or renovate housing units.[27]

Defendants rely on this language to argue that FHA disparate impact claims must target a more-widely implemented policy or practice. It argues that a one-time zoning decision cannot constitute a policy or practice, and that Plaintiffs' complaint fails to plead that the zoning decision constitutes a widespread practice, but rather specifically alleges that the rezoning denial was the only one in three years.

The Supreme Court's discussion of the limitations on FHA disparate impact liability in *Inclusive Communities* must be considered in light of the facts of that particular case. There, the plaintiffs challenged a program designed to increase low-income housing opportunities. They argued that the defendant's allocation of tax credits for such housing caused continued segregated housing patterns. The Court was concerned with a disparate impact claim based on such a theory of liability: "From the standpoint of determining advantage or disadvantage to racial minorities, it seems difficult to say as a general matter that a decision to build low-income housing in a

---

[27]*Id.* at 2523-24 (emphasis added).

-12-

blighted inner-city neighborhood instead of a suburb is discriminatory, or vice versa."[28] It cautioned that subjecting such discretionary decisions—those regarding how to best revitalize dilapidated housing or encourage low-income housing—to challenges under the FHA could lead developers and governmental bodies to adopt racial quotas, "inject[ing] racial considerations into every housing decision."[29] It also cautioned that unchecked FHA challenges to private developers' investment decisions, such as where to build and renovate housing units, could actually stymie low-income housing opportunities.[30] The Court's concern was with allowing the FHA to be used as "an instrument to force housing authorities to reorder their priorities" rather than one "to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects."[31]

An FHA challenge to a municipality's application of its zoning laws to a particular piece of property—while singular in nature—does not trigger the concerns outlined in *Inclusive Communities*. Such cases do not involve second-guessing a developer's investment decisions nor do they interfere with a government entity's attempts to improve or increase low-income housing. Instead, in such zoning cases, developers or land owners are alleging that a municipality's zoning laws and procedures have prevented them from creating diversified housing opportunities. Indeed, as argued by the Plaintiffs here, zoning decisions such as the one at issue appear to fall within what

---

[28]*Inclusive Cmtys.*, 135 S.Ct at 2523.

[29]*Id.* at 2523, 2524.

[30]*Id.* at 2524.

[31]*Id.* at 2522.

Justice Kennedy described as the "heartland of disparate-impact liability."[32] This "heartland" includes cases that challenge "zoning laws and other housing restrictions that *function* unfairly to exclude minorities from certain neighborhoods without any sufficient justification."[33] It includes cases where developers seek "to protect their property rights" against ordinances that in practice bar the construction of certain types of housing.[34] Here, the rezoning process is alleged to have functioned in such a way to exclude Hispanic homebuyers from an area in Yuma.

Moreover, the court agrees with Plaintiffs that the limitations of FHA disparate impact liability discussed in *Inclusive Communities* does not, as a matter of law, prohibit disparate impact claims that challenge a single decision by a municipality's governing body. That is, not all one-time decisions are equal. It is the type and effect of the single decision that dictates whether it can be subject to a disparate impact claim. A decision that involves applying zoning laws and procedures to a piece of property is a legislative action.[35] It involves much more than "a mere classification of a particular piece of property."[36] Rather, "it involves consideration of future growth and development, public streets, pedestrian walkways, drainage and sewers, increased traffic flows, surrounding property values and many other factors which are within the

---

[32]*Inclusive Cmtys.*, 135 S.Ct. at 2522.

[33]*Id.* (emphasis added).

[34]*Id.*

[35]Doc. 249-1 at p. 3; *see also Wait v. City of Scottsdale*, 618 P.2d 601, 602 (Ariz. 1980).

[36]*Wait*, 618 P.2d at 603.

legislative competence."[37] The act of zoning is, consequently, an act of policy making that sets it apart from other isolated decisions a municipality might make.

Indeed, the Second Circuit has also rejected a municipality's argument that an isolated zoning decision cannot constitute policy, stating that it would not "draw a line defining what constitutes a 'one-off' zoning 'decision.'"[38] Alternatively, the Second Circuit concluded that even if the distinction between a zoning decision and a zoning policy were relevant to disparate impact analysis, the zoning decision being challenged required a change in local law and had involved hearings, meetings, and discussions as to what effect the zoning would have on traffic and schools so that the details of the case fit "well within a classification of a 'general policy.'"[39] Likewise here, the denial of Plaintiffs' rezoning request involved hearings and discussions as to how neighboring developments in the area would be affected and also directly resulted in a change to the adjacent property's zoning to ensure future development in that area was reserved for the largest lots. The City was setting policy in that area.

The court's conclusion that zoning decisions inherently set policy is supported by municipal liability cases in the § 1983 context. In *Monell v. Department of Social Services of New York*,[40] the Supreme Court recognized that decisions of municipal legislative bodies constitute official policies for purposes of imposing municipal liability

---

[37]*Id.*

[38]*Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 619 (2d Cir. 2016).

[39]*Id.*

[40]436 U.S. 658 (1978).

-15-

in § 1983 cases.[41] Even a single decision is enough to impose such liability "whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by [a legislative] body constitutes an act of official government policy."[42]

Moreover, one of the Ninth Circuit's first cases recognizing disparate impact liability under the FHA, *Keith v. Volpe*,[43] involved a challenge to a single zoning decision. In *Keith*, the plaintiffs brought a disparate impact claim against a municipality based on its refusal to approve a developer's application for a lot split, a zoning change, and development permit. The court confirmed the validity of such a theory of liability and affirmed the lower court's conclusion that the municipality's denial of the developer's application had a disproportionate impact on minorities without adequate justification.[44] The City's reading of *Inclusive Communities*—as prohibiting as a matter of law any disparate impact challenges to a one-time zoning decision—would run contrary to the decision in *Keith*. The court does not believe that the Supreme Court's discussion in *Inclusive Communities* about the limitations of disparate impact liability is meant to overrule long-standing circuit law such as *Keith*.

The City argues that HUD's FHA disparate-impact regulations, put in place before the *Inclusive Communities* ruling, supports its contention that a disparate impact

---

[41]*Id.* at 690-95.

[42]*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

[43]858 F.2d 467 (9th Cir. 1988).

[44]*Id.* at 484.

claim can only challenge a widespread practice or policy and not a singular zoning decision.[45] The City relies on the use of the word "practice" in the regulation:

> Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, . . . even if the practice was not motivated by a discriminatory intent. . . . A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.[46]

The plaintiff has the burden of proving that "a challenged practice caused or predictably will cause a discriminatory effect."[47]

As argued in Plaintiffs' response brief, HUD's use of the word "practice" was not meant to distinguish government policies from government decisions. The guidance provided by HUD in connection to the publication of its final rule on disparate impact explains that a discriminatory housing practice is construed broadly to include "[a]ny facially neutral *actions*, e.g., laws, rules, *decisions*, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria."[48] Therefore, the regulation does not lend support to the City's argument that Plaintiffs cannot challenge a single zoning decision under a disparate impact theory of liability. Indeed, HUD's regulations would in fact lend support to Plaintiffs' position in that they

---

[45]Doc. 242 at p. 10.

[46]24 C.F.R. § 100.500(a).

[47]24 C.F.R. § 100.5000(c)(1).

[48]Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460-01, 11468 (Feb. 15, 2013) (emphasis added).

-17-

prohibit "*implementing* land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities."[49]

The City also argues that its interpretation of *Inclusive Communities* is correct based on subsequent lower court decisions. The cases cited by the City are those in which the courts have granted judgments in favor of defendants in FHA disparate impact cases based, at least in part, on the conclusion that a single, "one-off" decision cannot be considered an actionable policy or practice and cite *Inclusive Communities* in support for their conclusion. However, as noted by Plaintiffs in their response brief, "none of those cases involved exercise of zoning power imposing barriers to housing opportunities similar to the decision challenged in this case."[50] As the court concluded above, cases involving a challenge to a single zoning decision do in fact challenge a land use policy. Moreover, most of the cases cited by the City involve challenges to a government entity's exercise of discretion on behalf of legitimate health and safety objectives[51] or the exercise of discretion in deciding how to improve housing

---

[49]24 C.F.R. § 100.70(d)(5). In its reply, the City argues that even if the regulations support Plaintiffs' position, the court must then reject HUD's interpretation of the FHA given the Supreme Court's inconsistent interpretation of disparate impact liability in *Inclusive Communities*. *See Election Comm'n v. Democratic Senatorial Campaign Comm'n*, 454 U.S. 27, 31 (1981) ([C]ourts must reject administrative constructions of the statute . . . that are inconsistent with the statutory mandate or that frustrate the policy Congress sought to implement."). However, as noted above, the court concludes that *Inclusive Communities* does not in fact hold that disparate impact claims cannot be based on a city's individual zoning decision. Therefore, HUD's regulations are consistent with that opinion and entitled to deference.

[50]Doc. 249 at pp. 14-15.

[51]*See, e.g., City of Joliet v. New West, L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) (involving a city's decision to condemn an apartment complex); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1107 (9th Cir. 2017) (involving a challenge to the city's heightened housing code enforcement).

opportunities.[52] Those are exactly the type of cases the Supreme Court identified as requiring caution in the context of FHA disparate impact liability and as distinguishable from the "heartland" of disparate-impact cases—particularly those cases involving zoning laws that create barriers to housing without sufficient justification. Another case relied on by the city, *Barrow v. Barrow*,[53] dealt with a disparate impact claim against an attorney based on his creation and recording of a defective deed. The court dismissed the plaintiff's claim, finding that she did not identify any actual policy causing a disparate impact. Her claim was based on a single act by the defendant attorney regarding a single piece of property. The case is inapposite—it did not involve a municipal legislative decision like the situation presented here.

## V. CONCLUSION

For the foregoing reasons, the City's motion at docket 242 for summary judgment as to Plaintiffs' disparate impact claim under the FHA is DENIED. The City's request for summary judgment as to Plaintiffs' Count V in the second amended complaint is DENIED AS MOOT; plaintiffs concede that claim is not being pursued.

DATED this 29th day of January 2018.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT

---

[52]*Boykin v. Gray*, 986 F. Supp. 2d 14 (D.D.C. 2013) (involving the city's decision to shut down a homeless shelter as part of a shift toward permanent housing), *affirmed sub nom. Boykin v. Fenty*, 650 Fed. Appx. 42 (D.C. Cir. 2016).

[53]Case No. 16-11493, 2017 WL 2872820 (D. Mass. July 5, 2017).

-19-